# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re: | Case No. J15-00287-GS |
| JACK JASON PAGE, | Chapter 7 |
| Debtor. | |
| NEIL ATKINSON, | Adv. No. J15-90022-GS |
| Plaintiff, | |
| v. | |
| JACK JASON PAGE, | |
| Defendant. | |

## MEMORANDUM DECISION

In this adversary proceeding, plaintiff Neil Atkinson seeks denial of debtor Jack Jason Page's discharge under 11 U.S.C. § 727(a)(4)(A), on the grounds that the debtor has knowingly and fraudulently made a false oath in connection with his bankruptcy case. Atkinson's complaint alleges the debtor should be denied a discharge because he intentionally omitted "numerous creditors" from his schedules and statements. At trial, Atkinson argued the debtor failed to schedule a potential $6,000.00 claim against an unidentified broker as an asset of the estate, further supporting denial of his discharge. The court has considered the testimony and exhibits offered by the parties at trial, and the closing arguments of counsel. It has also taken judicial notice of the papers filed in Main Case No. J15-00287-GS. For the reasons stated herein, the court will dismiss the plaintiff's complaint, with prejudice.

I.      **FACTUAL BACKGROUND**.

   A.      **The Debtor's Petition and Initial Schedules**.

   The debtor is a single father with two sons.  At the time of trial, the debtor was 50 years old, and his sons were 14 and 18 years old.  He and his sons reside in Juneau, Alaska.  The debtor works seasonally as a charter boat operator, offering sportfishing and whale watching trips annually from mid-May to mid-September.  He supplements this income by working at the Baranof Hotel after the charter season ends.  He also occasionally cuts firewood and does tree work; he typically does this type of work in trade, or as a favor for friends.

   The debtor filed a chapter 7 petition on September 21, 2015.  His schedules listed assets with a total value of $23,297.05, the most valuable being a 2002 Chevy Silverado with 134,000 miles on it ($7,443.00), and an $8,000.00 claim for child support arrearages.  The debtor's schedules reflect that his former spouse's whereabouts are unknown.  The debtor testified at trial that his former spouse had serious substance abuse issues, and he did not expect to ever receive any support from her.  All of the debtor's listed assets were claimed exempt on his Schedule C.

   The debtor has no secured or priority debt.  He listed just three unsecured creditors on his schedules.  The debtor owes Bartlett Memorial Hospital $10,138.50 for medical services provided to his son in June 2012.  The following year, in October 2013, a judgment for $9,929.81 was entered in favor of plaintiff Neil Atkinson in an F.E.D. action.  The largest scheduled debt, for $64,000.00, is for a judgment entered March 12, 2015, in favor of the debtor's former partner, Russell McDougal, for partnership debt.  The debtor filed his bankruptcy petition roughly six months after this latter judgment was entered.

2

The debtor's Schedule G listed a month-to-month residential lease, and also a charter boat lease with Michael Logowski. An addendum to the schedules lists a debt of $614.00 for fuel for the debtor's leased fishing boat, without further information.

The debtor's Schedule I lists combined monthly income of $1,631.00, which sum includes $275.00 for food stamps. His monthly expenses include a rent payment of $1,200.00. His other listed expenses are conservative, but nonetheless exceed his monthly income by $1,124.00.

### B.    The Debtor's § 341 Meetings.

The debtor's initial § 341 meeting was held on October 22, 2015. The testimony he offered at this meeting amplified the information found in his schedules. He confirmed that his sportfishing charter business ran from mid-May to mid-September. The boat he used for this business was leased from Michael Logowski on a verbal, month-to-month agreement. He had co-owned a boat in a partnership with creditor Russell McDougal, but that partnership had dissolved two years earlier. McDougal sued the debtor prepetition in state court for a partnership accounting, resulting in the $64,000.00 judgment listed on his schedules.

The debtor's income sources during the rest of the year varied. He had done various odd jobs in an attempt to make ends meet, including carpentry or construction work, as well as residential tree removal.[1] Over the prior winter, he had performed maintenance work for the Baranof Hotel in Juneau, as reflected in the copies of his pay stubs filed with the court.[2] When queried about his charter boat income, the debtor said he maintained a personal log book that

---

[1] Pl.'s Ex. 8 (Tr. of § 341 Meetings of Creditors), at 8.

[2] Debtor's Payment Advices, ECF No. 17 filed in Main Case No. J15-00287.

3

contained the information.[3]  He is also required to keep a log book issued by the Alaska Department of Fish and Game, which does not require sales or income information.  When asked why he had filed bankruptcy, the debtor explained it was due to the "insurmountable debt with this judgment," and his situation as a single provider for his two boys, without support from his former wife.[4]

The § 341 meeting was continued three times to give the debtor time to provide documentation to the trustee and creditors in attendance.  Specifically, the debtor was asked to produce copies of the log books he maintained for his charter business, as well as his bank statements and tax returns.  The record reflects that the debtor has fully complied with the documentation requests made by all parties.  The § 341 meeting was also continued so Mr. Atkinson, the plaintiff in this action, could investigate the bona fides of the debtor's schedules.

During the second creditor's meeting, held on December 3, 2015, the debtor was examined regarding the entries in his personal log book for the 2015 charter season.  Dan Bruce, in his capacity as counsel for the debtor's former partner, Mr. McDougal, requested an explanation as to why 15 of the 72 charters listed for that season were "no charge," per the log book.[5]  The debtor responded that some of those trips had been "comps" for salespeople involved in charter booking, and others would have been personal trips, in which he had taken his sons or friends out on the boat for no charge.  The debtor also confirmed that he did not operate the

---

[3] Pl.'s Ex. 8 at 18:21-19:18.

[4] *Id.* at 10:25-11:4.

[5] Atkinson attended all of the debtor's § 341 meetings.  Attorney Daniel Bruce, who represents Atkinson in this adversary proceeding, also attended these meetings, but on behalf of the debtor's former partner, Mr. McDougal.  Atkinson initiated this adversary proceeding on his own behalf; Mr. Bruce did not enter an appearance on Atkinson's behalf in this matter until February 2, 2016.

4

boat at all once the charter season ended.  He stated that he was again working at the Baranof Hotel for the winter months.

Mr. Atkinson queried the debtor about two individuals, and whether he owed either of them any money.  The debtor stated he knew both Dick Cameron and Bret Russell.  He said he might owe Cameron "a couple hundred bucks" for rent or furniture.  When Atkinson responded that the amount owed was closer to $5,000.00, the debtor disagreed.  The debtor did concede that he owed Russell money.  Initially, he had owed Russell $6,000.00 for a personal loan, but he explained that he did not list it on his schedules because it was a personal loan with a friend.  The debtor said that he had tried to make payments to Russell when he could, and remembered making two $200.00 cash payments to him during the past charter season.  On follow up questioning from the trustee regarding the Russell obligation, the debtor said the amount now due was probably around $8,000.00 to $9,000.00, and that the omission of the debt was oversight on his part.  Atkinson offered to contact Russell "to get his side of the story."[6]  The trustee declined this offer, instead indicating that she would instead get Russell's phone number from Atkinson after the meeting and contact him herself.  The trustee also asked Atkinson how he knew Russell.  Atkinson explained that Juneau is a small town, and he knew Russell through mutual friends.

At the third creditor's meeting, held less than two weeks later on December 15, 2015, Atkinson continued his questioning of the debtor.  He asked the debtor why he did not list income from his tree work.  The debtor reiterated his earlier testimony; the little bit he had done recently was just helping a friend in a "trade" arrangement where he exchanged the work for

---

[6] Pl.'s Ex. 8 at 44:24-45:1.

5

firewood.[7]  Atkinson also revealed that he had talked to Mr. Logowski, the lessor of the debtor's charter boat, just the prior evening.  He stated that Logowski had told him that the debtor owed him "a substantial amount" of money.   The debtor refuted this, maintaining that he and Logowski were "square" for the 2015 season.[8]  He further stated that he had done some tree work at Logowski's fishing lodge, again in trade, as payment towards the boat lease.[9]

Both Atkinson and the trustee re-examined the information in the debtor's personal log book for the 2015 season.  The debtor's explanations regarding the "no charge" trips were consistent with his prior testimony.  He denied that the "no charge" trips instead reflected cash sales.  He asserted his log book was very accurate; he had been doing charters for 20 years and, "[e]very time the boat leaves the dock, I write down the hours on the boat, the trip, where we went, tides, who went."[10]

During the third meeting of creditors, the debtor was again examined as to his reasons for filing bankruptcy.  He said that the partnership with McDougal was what "really put [him] under," because the boat used in that partnership just kept breaking down, and kept racking up repair bills.[11]  Every time the boat was out of the water for repairs, he lost fishing trips and had to either pay back deposits or put his customers on other boats.  Given the short, four-month charter season, he said it didn't "take much to trip you up and go backwards in a hurry."[12]  But

---

[7] *Id.* at 52-53.

[8] *Id.* at 53-54.

[9]  *Id.* at 55.

[10] Pl.'s Ex. 8 at 59:20-24.

[11] *Id.* at 60:17-24.

[12] *Id.* at 61:10-13.

the debtor remained hopeful about his charter prospects; he was "absolutely" going to operate the business during the upcoming season and "try to make it work."[13]

The § 341 meeting was continued one final time, to January 27, 2016. Although the debtor was questioned further about his work at the Baranof Hotel and the firewood work he had done, his testimony yielded little new information.

### C.    Atkinson's Adversary Complaint.

Atkinson filed his complaint objecting to discharge on December 18, 2015. The adversary complaint seeks denial of the debtor's discharge under § 727(a)(4)(A) on the grounds that the debtor has "filed false and materially misleading schedules and statements under oath."[14] It alleges that, based on the course of questioning at the debtor's meeting of creditors, "it appears" the debtor has left off more creditors than he has listed on his verified schedules, and that the debtor has not amended his schedules to correct these omissions.[15]

Although the chapter 7 trustee is well aware of Atkinson's efforts to track down the debtor's omitted creditors, she has not joined in this adversary proceeding. She concluded the § 341 meeting on January 27, 2016, and five days later filed her Report of No Distribution in the underlying bankruptcy case. She did not attend the trial of this matter.

### D.    Debtor Amends his Schedules.

The debtor filed amended Schedules E/F and H on the eve of trial, November 3, 2016.[16] In Amended Schedule E/F, he added three unsecured creditors: Bret Russell for a personal loan

---

[13] *Id.* at 61-62.

[14] Compl. to Deny Discharge, ECF No. 1, ¶ 16.

[15] *Id.* at ¶¶ 13, 14.

[16] *See* ECF No. 32 filed in Main Case No. J15-00287-GS.

in the amount of $7,500.00; Dick Cameron for a debt in an unknown amount and type; and George Fisher for $584.43 relating to utilities. All three claims are listed as disputed. The debtor's Amended Schedule H added Dana Page, the debtor's former spouse, as a codebtor, as well as Jeff Hastings as a codebtor specifically with reference to the Russell debt.

### E.   Trial.

This matter was tried in Juneau on November 4, 2016, with a final witness testifying by telephone on November 7, 2016. In addition to the debtor and Atkinson, testimony was offered by George Fisher, Bret Russell, and Richard Cameron.

#### 1.   Debtor's Testimony.

At trial, the debtor's testimony remained essentially consistent with his earlier § 341 testimony. He amplified the reasons for filing bankruptcy, saying that his "downward spiral" started at the end of the 2013 charter season.[17] The debtor further explained that he been "stiffed by a broker" for about $6,000.00 (the "Broker Claim"), and had trouble paying his rent. Prior to his bankruptcy filing, he had tried to recover from the broker, without success. Around this same time his partnership with McDougal "went south." The partnership's boat kept breaking down. He had to get it fixed three times, racking up substantial repair costs. The partnership failed, and McDougal ultimately got the $64,000.00 judgment against him.[18] He had to find a new boat to continue his charter business. His verbal, month-to-month boat lease with Logowski

---

[17] The debts listed on the debtor's schedules support this assertion; he was carrying his son's substantial medical debt when he entered the 2013 charter season, and Atkinson's $9,000.00 F.E.D. judgment was entered just a few months after the season ended.

[18] McDougal initiated the state court action against the debtor on June 17, 2014; the judgment itself was entered February 9, 2015. *See* Adversary Complaint, ECF No. 1 at 3, and copy of Final Judgment, Ex. 4 to McDougal's Mot. for Summ. J., ECF No. 11-4, filed in *McDougal v. Page*, Adv. No. 15-90019.

8

was essentially a "handshake" deal, and the debtor only paid rent for the four months he used the vessel.

The $64,000.00 judgment had a significant impact on the debtor. The failure of the partnership was the culmination of three years of hard luck. The debtor credibly testified to being overwhelmed by the amount of the judgment, which, in turn, caused considerable fear that he was going to lose his vehicle.[19] The debtor depended upon his car for his livelihood, and to take care of his children. He said filing for bankruptcy had given him financial relief, and the ability to pay his rent and raise his sons without the burden of "exponential payments."

The debtor clarified that the medical debt listed on his schedules was attributable to his son, who had been in a vehicle accident in 2012, and that this obligation was not covered by insurance. In fact, he indicated that insurance coverage for himself and his sons had been sporadic; he had Medicaid coverage off and on. He disclosed that he also had a medical condition, but that none of the scheduled medical debt was on account of his personal medical needs.

Extensive questioning regarding whether the debtor had received or concealed other sources of income revealed nothing of significance. The debtor estimated he might receive as much as $3,000.00 in tips over the duration of the charter season. He again reiterated that he received no cash for his timber and firewood services, which were offered in trade.

The debtor conceded he had signed his initial schedules and statements under oath, and that he had reviewed those documents before signing them. He stated he believed the schedules were accurate at the time he signed them, but admitted that he had, in fact, omitted some creditors. He also agreed that he should have amended his schedules sooner.

---

[19] The debtor owned a 2002 Chevy Silverado with 150,000 miles on it as of the petition date.

9

### 2.    Neil Atkinson.

Atkinson testified about the circumstances that culminated in the F.E.D. judgment he obtained against the debtor in October 2013.  He said a friend had contacted him to see whether he had a place that he could rent to the debtor.  He was sympathetic to the debtor's situation, because he was a single parent himself.  The debtor signed a rental agreement with him in October of 2012, and was to begin making rent payments in January of 2013.  Although he did receive some checks from the debtor for partial payments, Atkinson said they all bounced and, ultimately, he received no rent from the debtor.

Atkinson testified that he contacted the debtor constantly about getting paid.  He also recalls writing two letters.  He said the debtor offered a variety of excuses.  Early in the spring of 2013, the debtor told him that he was working on a project, trying to get money together to get into a new charter business.  The debtor promised he would get caught up once the charter season started.  Finally, Atkinson decided that he had enough.  He filed the F.E.D. action and obtained the $9,000.00 judgment.  He did not try to collect on the judgment, however, until just before the debtor filed bankruptcy.  Atkinson said he was just getting ready to initiate collection efforts when he learned that the debtor had filed.  He said that, when he received notice of the bankruptcy, he "went through the roof."  He was very angry.  While he stopped the collection proceedings, he "dug in" and tried to find a way to "protest" the bankruptcy.  He put out feelers in Juneau to find out who else was owed money by the debtor.

On cross examination, Atkinson admitted that he personally knew both Bret Russell and Dick Cameron.  His daughter used to date Russell.  Atkinson testified that he talked to Russell about the debtor shortly after obtaining his F.E.D. judgment, and Russell informed him at that time that the debtor also owed him money.  He also stated that he has known Cameron personally and professionally for "probably 35 years."  Atkinson said he did not personally know

10

George Fisher, but learned that the debtor owed him money when he "asked around" Juneau.

### 3.    Bret Russell.

Atkinson's counsel questioned the debtor in detail about the Russell debt.  The debtor again explained he left Russell off his schedules due to oversight, because he did not know what he was doing.  According to the debtor, the $6,000.00 loan was a handshake deal with a friend, and he shared the obligation with another individual, Jeff Hastings.  The two of them intended to use the money to develop a marketing plan and a website that would benefit both of their tourism businesses.[20]  The loan was seed money for this venture.  Hastings was the one who was to develop the website, but the debtor said "it never did roll."  With interest and penalties for nonpayment, the obligation had increased to about $8,000.00 or $9,000.00.  The debtor testified that he had met with Russell a few times and amended the amount of the debt to account for the penalties and interest.  He also said he had made intermittent cash payments to Russell as he could.  Hastings never made any payments towards the debt, although the debtor said he had tried to get him to do so.

Russell testified that he has known the debtor for 15 to 20 years, and they have mutual friends.  Russell said the initial loan was just between himself and the debtor.   He agreed to extend the loan in October 2012, when the debtor asked to borrow money to "get things rolling" in his summer charter operation.  He had the debtor write up a note at that time, which required

---

[20] The debtor said Hastings had no interest in his charter business, but had a separate tour business. He explained that the website was a "scratch my back, I'll scratch yours" situation in which they each anticipated a benefit to their seasonal businesses.

repayment of the full amount in two months with "interest of 12.5% or $750.00" by January 19, 2013.[21]

Russell said that when the loan was not repaid in January 2013, the debtor explained to him that he hadn't gotten as many "holds" for the 2013 summer season as he had anticipated. A second note was written and signed by the debtor in January 2013. This note included Hastings, and Russell met Hastings at the time this second note was signed. Russell surmised that Hastings was the debtor's business partner, "the guy behind the scenes," doing marketing, while the debtor was the "actual guy on the boat taking the charters." The new note provided that interest would accrue on the debt "every 3 months at 12.5% until balance is paid," but no payment deadline was set.[22]

A third note was signed by the debtor and Hastings on March 28, 2013.[23] Russell said this note represented "just an extension of the original loan." He explained that the obligation was an "open ended contract; it was just thrown together." He asked for the third note because "nothing was happening," and he wanted to get a payment plan started. The third note contained two alternative repayment provisions. One required full repayment of the loan, plus an additional sum of $750.00, for a total amount of $6,750.00 to be paid by January 31, 2013.[24] The debtor could not have complied with this provision, given that the note itself was dated two months after this payment deadline. The other repayment provision required that the full amount

---

[21] Pl.'s Ex. 7 at 1.

[22] *Id.* at 2.

[23] *Id.* at 1.

[24] *Id.*

of the loan, plus an additional $1,500.00, for a total payment of $7,500.00, be paid by June 30, 2013, "whichever comes first."[25]

Russell asked for the third note to be notarized, believing that this detail would help if the note was contested in court. He made some effort to collect the debt in 2013. He would telephone the debtor to ask him what was going on, or would bring up the subject when he ran into the debtor in Juneau. Russell recalled the debtor telling him that the motor on his charter boat had blown up. The debtor would also tell him he was having trouble finding work.

Russell confirmed that the debtor had made sporadic payments, one being as large as $1,000.00, and two other payments that totaled $300.00. He also remembered the debtor once paying him $100.00 in cash towards the debt when they met by coincidence at the Safeway parking lot.

Russell did not have an accounting of the debt, but estimated that the debtor currently owed him at least $6,200.00. Although he was in and out of town a lot, Russell said he would try to contact the debtor about once a month, or every two months, whenever he was in Juneau to see about repayment. He believed the last time he contacted the debtor about repayment was in August 2015, one month before the debtor's petition was filed. He also confirmed that he never made any written demand on the debtor for repayment of the loan after the third note was executed in March of 2013.

### 4. George Fisher.

At trial, the debtor testified that he was not aware of any debt owed to George Fisher. Fisher had owned a condominium in Juneau that the debtor rented in 2014. The debtor said his

---

[25] Pl.'s Ex. 7 at 1.

tenancy with Fisher ended in 2014 when the building ownership changed.  He continued to live in the condominium for an additional six months, renting from the new owner, but did not believe he owed Fisher any money from that tenancy.

Fisher confirmed that the debtor was his former tenant, and that he sold the building in which the debtor was living in January of 2015.  He said the debtor had signed a lease, although he no longer had that document.  He stated that the debtor owed him money on account of unpaid utilities from the rental unit.  After the building was sold, Fisher received a notice of impending tenant disconnection from Alaska Electric Light and Power Company reflecting that the debtor had not paid his utility bill for the final month before the building was sold to new owners.[26]  Fisher calculated that the debtor's share of the utilities for that month was $1,024.43.[27]  He testified that he gave a copy of the disconnect notice to the debtor, who repaid Fisher some of the debt sometime before he filed bankruptcy.  Fisher recollected that the debtor received a public assistance grant to help pay for heating costs, and that the debtor had turned this check over to him, plus some cash, to help pay the outstanding utility bill.

As of the petition date, the debtor owed Fisher $584.43.  Fisher said he has never sent any written demands to the debtor for repayment on this obligation.  He had written the obligation off, believing he wasn't going to get further payments.  Fisher further testified that he had been subpoenaed to appear at trial by Atkinson's counsel.  He said he has never met Atkinson, but he

---

[26] Pl.'s Ex. 9.

[27] When Fisher owned the building, he would divide the utility costs for the entire property equally among his tenants.

14

thinks Atkinson found out the debtor might have owed him money by talking to various people in Juneau.

### 5. **Dick Cameron**.

At trial, the debtor testified that he did not owe Cameron any money.  Cameron was an old friend the debtor had worked with at Anchorage Choice many years ago.  The debtor had also rented a furnished condominium from Cameron in 2011.  He said he had paid all rent due Cameron.  He further testified that, after he had committed to a one-year lease on the condominium, Cameron told him he needed to get out within a week because he had sold the unit.  The debtor said Cameron took most of his furniture with him, but had told the debtor he could take the living room set.

Cameron testified telephonically at trial.  He clarified that he has known the debtor since the early 1990's.  He and his wife had employed the debtor as a charter captain in connection with a small fishing lodge they had on the Gulf Coast.  Cameron had also rented a couple of properties to the debtor.  He testified that the debtor had difficulty keeping up with the rental payments at both properties.

The last time Cameron rented a residential property to the debtor was in 2013.  The debtor had contacted him before moving back to Juneau from Washington to see if he knew of any affordable places to rent.  Cameron had a condominium in a "Del Rey" development, that he was able to rent to the debtor because he was working outside of Juneau during the time.  However, he subsequently sold it and had to remove all the furniture,  several items of which he sold to the debtor.  Cameron estimated the value of this furniture at $3,500.00.  Cameron also

15

said the debtor owed him between $1,000.00 and $1,500.00 in rent.  The total amount owed at that time would have been around $5,000.00.

Cameron said he did not give the furniture to the debtor.  But, he also knew it would be some time before the debtor could repay him.  He was sympathetic to the debtor's situation, because he knew he would have to relocate, and was having difficulties with work.  He expected the value of the furnishings and the bit of unpaid rent would be paid "sometime in the future." He never established a payment schedule, instead leaving this up to the debtor.  Cameron said the debtor would voluntarily select the payment dates and amounts to be paid, but could never follow through with actual payments.  Cameron has never received a payment from the debtor. Nonetheless, he was adamant that he did not have a claim against the debtor.  He said he had gotten tired of waiting for payments, and had told the debtor, prior to the time he filed bankruptcy, that he was washing his hands and had forgiven the debt.

## II.    JURISDICTION.

The court has jurisdiction and authority to enter final judgment on Atkinson's claims to deny the debtor his discharge pursuant to 28 U.S.C. § 1334(b), and 28 U.S.C. §§ 157(b)(1) and (b)(2)(J).

## III.    ANALYSIS.

Bankruptcy exists to provide a "'fresh start' to the 'honest but unfortunate debtor.'"[28] Here, Atkinson contends the debtor is not honest, because he made false oaths on his schedules by omitting three creditors and one potential asset.    However, to deny a discharge,

---

[28] *Marrama v. Citizens Bank of Mass.,* 549 U.S. 365, 367 (2007)(quoting *Grogan v. Garner,* 498 U.S. 279, 286 (1991)).

§ 727(a)(4)(A) requires more than simple omissions.  The court finds that the plaintiff has failed to carry his burden of proof that the debtor knowingly and fraudulently made false oaths in this case.

### A.      Section 727(a)(4)(A) – Elements and Burden of Proof.

Under § 727(a)(4)(A), a debtor who "knowingly and fraudulently, in or in connection with the case," makes "a false oath or account," cannot receive a discharge.[29]  "The fundamental purpose" of this subsection "is to insure that the trustee and creditors have accurate information without having to conduct costly investigations."[30]  A party objecting to the debtor's discharge under § 727(a)(4)(A) must establish, by a preponderance of the evidence, that ''(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently.''[31]

### 1.      Omissions from the Debtor's Initial Schedules

A false statement in, or an omission from, the debtor's bankruptcy schedules "can constitute a false oath."[32]  Here, Atkinson argues the debtor's schedules contain false oaths because the debtor failed to list three creditors and omitted one potential asset of the bankruptcy estate.  He further contends that these omissions were not nullified by the amended schedules that the debtor filed on the eve of trial, and that the debtor's discharge must be denied.

---

[29] 11 U.S.C. § 727(a)(4)(A).

[30] *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010)(quoting *Khalil v. Developers Sur. and Indem. Co. (In re Khalil)*, 379 BR 163, 172 (B.A.P. 9th Cir. 2007)).

[31] *In re Retz*, 606 F.3d at 1197 (quoting *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (B.A.P. 9th Cir. 2005)).

[32] *Id.* at 1196 (quoting *In re Khalil*, 379 BR at 172).

17

The evidence reflects that the debtor omitted certain information from his initial schedules.  The debtor concedes this point.  He has amended his schedules to list the three "new" creditors who testified at trial, although the Broker Claim remains unscheduled.  Thus, the first element of § 727(a)(4)(A), that the debtor made a false oath in connection with his case, is satisfied.

## 2.    Materiality of Omissions.

The relevant false oath must relate to a material fact.[33]  "A fact is material 'if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.'"[34]  Conversely, "a false statement or omission that has no impact on a bankruptcy case is not material and does not provide grounds for denial of a discharge under § 727(a)(4)(A)."[35]

Atkinson argues that the debtor's omission of the three creditors is material because these additional creditors increased the debtor's total scheduled unsecured debt from $83,168.31 to $91,252.74.  This fact, alone, is insufficient to make the omission of the three creditors material.  Two of the three creditors, Cameron and Fisher, had written off their claims before the debtor filed bankruptcy, and none had ever sent the debtor a written payment demand or otherwise sought to formally enforce collection.  It is not uncommon for debtors to omit a few creditors from their bankruptcy schedules.  The simple fact that the three creditors were omitted had no impact whatsoever on the debtor's bankruptcy case.

---

[33] *Id.* at 1198 (citing *In re Roberts*, 331 BR at 882).

[34] *Id.* (quoting *In re Khalil*, 379 BR at 173).

[35] *In re Khalil*, 379 B.R. at 172 (citation omitted).

18

Atkinson further contends the debtor's failure to schedule the Broker Claim is material. The debtor testified at trial that his downward financial spiral started in 2013, when he was "stiffed" by an unidentified broker for $6,000.00.  He also testified that he unsuccessfully tried to recover on this claim.  The court notes that the debtor was in considerable need for money at the time he attempted to collect the debt, and was highly motivated to liquidate the receivable. His inability to do so in 2013 clearly affected how he viewed the receivable – as worthless – at the time he filed his petition.  However, for purposes of § 727(a)(4)(A), materiality is not a particularly high hurdle to overcome.  Any debts or assets, even if uncollectable, bear *some* relationship to "the existence and disposition of the debtor's property."[36]  For this reason, the court finds that the debtor's omissions were material as that term is defined for purposes of the § 727(a)(4)(A) claim.

### 3.      Omissions were made Knowingly.

To succeed on his § 727(a)(4)(A) claim, Atkinson must prove that the debtor acted knowingly in making the false statement or omission.  This element is established if it can be shown that the debtor acted "deliberately and consciously" in making the false oath.[37]  Of the three omitted debts, the one owed to Russell is the most problematic.  It is the only one that was documented in any fashion, although in a bare-bones manner indicative of a loose agreement between friends.  While Russell remained interested in collecting the debt, his efforts consisted of casual reminders, consistent with the friendship.  Further, the debtor recognized the debt and

---

[36] *Retz*, 606 F.3d at 1198 (quoting *In re Khalil*, 379 B.R. at 173).

[37] *Id*.

19

attempted to make payments on it as he could.  Indeed, Russell testified that he discussed the debt with the debtor roughly a month before the bankruptcy filing.

On this evidence, it is tempting to conclude that the debtor knowingly omitted the Russell debt from his schedules.  To do so, however, would ignore the totality of the debtor's situation when he filed for bankruptcy.  Financial desperation is a heavy weight to carry, and it multiplies considerably when not only you, but your family members, are affected.

The debtor testified credibly and convincingly that, when he filed for bankruptcy, he felt he was facing insurmountable debt, was having difficulty supporting his family, and was facing the possible loss of his vehicle, upon which he depended to make his livelihood.  The evidence reflects that the debtor's liabilities had mushroomed over the past three years.  First, his son was in a vehicle accident in 2012.  Then, the partnership vessel required inordinate repair costs during the 2013 charter season, resulting in a loss of substantial business and difficulties in paying rent.  Atkinson obtained his $9,000.00 F.E.D. judgment against the debtor in October 2013, and the debtor's former partner initiated a suit for a partnership accounting and other damages in state court the following year.  The $64,000.00 partnership judgment was entered against the debtor in February 2015, and the debtor was facing collection proceedings by both McDougal and Atkinson.  In short, the debtor was trying to survive, and was looking at the big picture.  The Russell debt, as well as those owed to Cameron and Fisher, were literally the least of his problems at that time.  The debtor's financial desperation and concern for his family were forcefully conveyed at the trial, not only through his testimony but by his demeanor and body language.[38]

---

[38] As other courts have recognized, it is not unusual for a debtor to file bankruptcy "because of the crushing weight of a judgment." *Sullivan v. Harnisch (In re Sullivan)*, 522 B.R. 604, 615 (B.A.P. 9th Cir.

Based upon this evidence, I find that the debtor's omission of the Russell debt was neither deliberate nor conscious. Rather, it was an honest mistake.[39] This conclusion is buttressed by the debtor's continued willingness to openly discuss the Russell debt, as well as the other omitted debts. Additionally, the testimony offered regarding the Fisher and Cameron debts establishes substantial confusion as to whether any such debts were, in fact, owed at the time the debtor filed his petition. At a minimum, the court is convinced the debtor did not believe that there were any such debts outstanding at the time he filed his bankruptcy.

Finally, the court is convinced that, to the extent the debtor realized the existence of a potential asset, he genuinely believed the Broker Claim was worthless. He had tried to recover from the broker back in 2013, without success. While the debtor mistakenly believed that it was not necessary to list an uncollectible asset, he did not deliberately or consciously omit it from his schedules.

### 4.   Omissions were made Fraudulently.

The final element of a § 727(a)(4)(A) claim requires proof that the debtor acted fraudulently in making the false statement or omission. In this context, fraudulent intent has three components: (1) the debtor made the false statements or omissions, (2) at the time he knew they were false, and (3) the debtor made them with the intention and purpose of deceiving his

---

2014)(quoting *In re Marshall*, 298 B.R. 670, 683 (Bankr. C.D. Cal. 2003)); *In re Hyatt*, 479 B.R. 880, 895 (Bankr. D.N.M. 2012); *Marshall v. Marshall (In re Marshall)*, 403 B.R. 668, 691 (C.D. Cal. 2009)(citations omitted), *aff'd* 721 F.3d 1032(9th Cir 2013)).

[39] Given the court's emphasis on the context of the debtor's situation at the time he filed for bankruptcy, it bears mention that the debtor's counsel is located in Ketchikan, Alaska, while debtor resides in Juneau, Alaska. The significance of this is apparent to Alaskans, as one must travel between these locations either by air or sea. Indeed, by consent of all parties, debtor's counsel appeared telephonically at trial so that the associated costs to travel to Juneau would not be incurred. This is not offered as justification for filing erroneous schedules, but to provide further context militating against a finding that the debtor knowingly or fraudulently omitted creditors.

creditors.[40]    A debtor's intent is often established through circumstantial evidence or by inferences drawn from the debtor's course of conduct.[41]  While a debtor's reckless indifference or disregard for the truth may be circumstantial evidence of intent, it "is not sufficient, alone, to constitute fraudulent intent."[42]

While the question of whether the debtor *knowingly* omitted debts is a close question, there is simply no evidence that his omissions were made with fraudulent intent.  As already stated, the debtor was a very credible witness.  His testimony was straightforward, consistent, and genuine.  From the time of his initial creditor's meeting, he conceded that he owed Russell money, and that he should have listed him on his schedules.  Cameron and Fisher are essentially "phantom creditors," in that they had written off the prospect of collecting from the debtor before the bankruptcy petition was ever filed, and had never actively pursued collection.  Fraudulent intent cannot be found under these circumstances.

The court reaches the same conclusion with respect to the unscheduled Broker Claim for $6,000.  This claim apparently accrued sometime in 2013, two years before the debtor filed his petition.  Aside from the debtor's assertion that he was "stiffed by a broker," the court has no other information as to this potential asset.  Given his desperate financial circumstances, the debtor would have pursued this asset if it had any value.  Again, the court attributes the debtor's failure to schedule this potential asset to honest oversight, rather than an intent to deceive his creditors.

---

[40] *Retz*, 606 F.3d at 1198-99 (quoting *In re Khalil*, 379 B.R. at 173).

[41] *Id*. at 1199 (citing *Devers v. Bank of Sheridan, Mont. (In re Devers)*, 759 F.2d 751, 753-54 (9th Cir. 1985)).

[42] *Id*. at 1199 (citing *In re Khalil*, 379 B.R. at 173-75).

22

In sum, the debtor made mistakes in his schedules. Many, if not most, debtors do. But mistakes alone do not warrant denial of discharge. These mistakes were innocently made, and de minimis in the context of this case. Atkinson has failed to carry his burden of proof in establishing that the debtor knowingly and fraudulently made a false oath in this case, as required to deny a discharge under § 727(a)(4)(A).

### B.    Debtor's Request for Costs and Attorney's Fees.

In his answer, the debtor requested an award of costs and attorney's fees. However, under the American Rule, attorney's fees are generally not recoverable for litigating federal issues absent an agreement or specific statutory authority.[43] While § 523(d) permits a prevailing debtor to recover reasonable attorney's fees if the position of a creditor objecting to discharge of a consumer debt was not substantially justified, there is no parallel provision that authorizes the court to award attorney's fees to a debtor who successfully defends against a § 727(a)(4)(A) claim seeking denial of discharge.

It is clear to the court that Atkinson is a very frustrated creditor. He took it upon himself to track down the debtor's omitted creditors. He found just three, who were owed nominal amounts, two of whom had forgiven their debts. Atkinson subpoenaed these creditors to testify at trial. At one of the creditors' meetings, he asked the trustee to "deny [the debtor's] request for bankruptcy" because otherwise the debtor would be "relieved of his responsibility for his past debts."[44] The court recognizes Atkinson's frustration; creditors do not like bankruptcy. However, Atkinson's efforts to deny the debtor's discharge were not made purely for the purpose of harassing the debtor, such that an award of fees might be considered appropriate under Fed.

---

[43] *Alyeska Pipeline Serv. Co. v. Wilderness Society,* 421 U.S. 240 (1975).

[44] Pl.'s Ex. 8 at 62:11-17.

R. Bankr. P. 9011 or 28 U.S.C. § 1927.[45]  For these reasons, the debtor's request for an award of attorney's fees will be denied.  Each party to this action shall bear their own attorney's fees. However, the debtor may recover his costs, under Fed. R. Bankr. P. 7054(b)(1).

**CONCLUSION**

For the foregoing reasons, Atkinson's complaint to deny the debtor a discharge under § 727(a)(4)(A) shall be dismissed, with prejudice.  The debtor shall recover his costs of suit, but each party shall bear their own attorney's fees.

An order and judgment shall be entered consistent with this memorandum.

DATED:   May 15, 2017.

BY THE COURT

 /s/ Gary Spraker_____
GARY SPRAKER
United States Bankruptcy Judge

Serve:  D. Bruce, Esq.
          M. Heiser, Esq.

---

[45] *See Summerlin v. Outlaw (In re Outlaw)*, 66 BR 413, 418 (Bankr. E.D.N.C. 1986)(discussing Fed. R. Bankr. P. 9011 and 28 U.S.C. § 1927, and noting that, "When a plaintiff pursues a section 727 objection to discharge without any reasonable hope of prevailing on the merits, it is appropriate to award the debtor his reasonable expenses and fees incurred in defending against the suit.").